# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                      )
CHARLES SINGLETARY,                   )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )        Civil Action No. 09-0752 (ABJ)
                                      )
DISTRICT OF COLUMBIA,                 )
                                      )
                    Defendant.        )
_____ )

## MEMORANDUM OPINION

   This case presents the question of whether the District of Columbia can be held liable

under 42 U.S.C. § 1983 for a parole revocation decision made by the District of Columbia Board

of Parole that violated plaintiff's right to due process under the Fifth Amendment to the U.S.

Constitution.  For the reasons set forth below, the Court concludes that the municipality can be

held liable for the unconstitutional revocation of Mr. Singletary's parole.  Therefore, plaintiff's

motion for summary judgment will be granted, and the defendant's cross motion will be denied.

## I.    BACKGROUND

### A.    Factual Background

   In 1990, plaintiff Charles Singletary was released on parole after serving more than seven

years of a nine to twenty-seven year sentence for armed robbery.  Singletary Decl. ¶ 2.[1]  He

remained on parole successfully for five years, but in June of 1995, he was arrested as an alleged

participant in the murder of Leroy Houtman.  *Id.* ¶ 3–4; Pl.'s Interrog. Resp. at No. 7.  The

charges were soon dropped at the preliminary hearing, and he was never indicted by a grand jury.

_____

1    The Court set out the factual background of this case in great detail in *Singletary v. District of Columbia*, 685 F. Supp. 2d 81 (D.D.C. 2010).

Singletary Decl. ¶ 4. Yet a year later, the District of Columbia Board of Parole ("the Board")

held a hearing to consider whether to revoke his parole. *Id*. ¶ 6; Pl.'s Interrog. Resp. at Nos. 8.

The evidence presented at the parole revocation hearing was limited to (1) a narrative given by

the prosecutor and (2) testimony by a police detective. *Singletary*, 685 F. Supp. 2d at 84.

Neither of these individuals had first-hand knowledge of the facts, and their testimony was based

on statements made by two individuals who themselves had no first-hand information, but rather,

reported on conversations with the woman who was convicted of conspiracy in connection with

the murder. *Id*. The Board revoked Singletary's parole and he was was re-incarcerated. *Id*.

Singletary remained in prison for ten more years, Singletary Decl. ¶ 8, as he challenged

the parole revocation in habeas proceedings first in Superior Court and then in federal court. *Id*.

¶ 10. The D.C. Superior Court denied Singletary's first petition for writ of habeas corpus in

1997 and that denial was upheld by the D.C. Court of Appeals. *Id*. In 2000, Singletary again

sought habeas relief in Superior Court but the court denied his claim and the D.C. Court of

Appeals affirmed that decision. *Id*. ¶ 11. Singletary represented himself in both of these

proceedings. *Id*. ¶ 12.

With the assistance of a federal public defender, Singletary petitioned for a writ of habeas

corpus in the U.S. District Court for the District of Columbia. Singletary Decl. ¶ 13. That

petition was denied, *Singletary v. D.C. Bd. of Parole*, No. 00-1263, 2003 WL 25258497 (D.D.C.

Dec. 16, 2003), and Singletary appealed the decision. Singletary Decl. ¶ 14. On July 7, 2006,

ten years after the plaintiff's parole had been revoked, the U. S. Court of Appeals for the District

of Columbia finally granted relief. The Court held that the Board's decision did not comport

with due process because the parole revocation was based on such a "shoddy" record that it

violated Singletary's constitutional right to due process. *Singletary v. Reilly,* 452 F.3d 868, 869

(D.C. Cir. 2006).  The court ordered that Singletary be provided with a new parole revocation

hearing.  *Singletary*, 452 F.3d at 873–75.

In reaching its decision, the Court of Appeals noted that in *Morrissey v. Brewer,* 408 U.S.

471 (1972), the Supreme Court ruled that a parolee is entitled to a hearing before a final decision

on revocation can be made, and it set out the minimum due process requirements for such a

hearing:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee
> of evidence against him; (c) opportunity to be heard in person and to present
> witnesses and documentary evidence; (d) the right to confront and cross-examine
> adverse witnesses (unless the hearing officer specifically finds good cause for not
> allowing confrontation); (e) a "neutral and detached" hearing body such as a
> traditional parole board, members of which need not be judicial officers or
> lawyers; and (f) a written statement by the factfinders as to the evidence relied on
> and reasons for revoking parole.

*Id.* at 489.  According to the Court of Appeals:

> Parole revocation violates due process if the decision is either totally lacking in
> evidentiary support or … so irrational as to be fundamentally unfair . . .
> [R]eliance on hearsay in parole revocations hearings is not per se impermissible.
> However, the use of unsubstantiated or unreliable hearsay would certainly
> eviscerate the safeguards guaranteed by *Morrissey* and *Gagnon*.

*Singletary,* 452 F.3d at 872 (internal quotation marks and citations omitted).  Thus, in a parole

revocation hearing, hearsay evidence must be "both sufficient in quantity and reliability to ensure

fundamental due process rights."  *Id*., citing *Crawford v. Jackson,* 323 F.3d 123, 128 (D.C. Cir.

2003).  The court concluded that in Singletary's case, while the quantity of the evidence was not

an issue, "the hearsay presented at the hearing was not demonstrated to be reliable," and "the

Board's decision to revoke Singletary's parole was therefore 'totally lacking in evidentiary

support.'"  *Id.*, quoting *Crawford*, 323 F.2d at 129.  The Court made it clear that it was not

overturning the Board's decision because it had been based on hearsay; rather, it held that "the

government has not established that the hearsay deemed adequate by the Board was sufficient in

reliability to ensure fundamental due process rights." *Id.* at 874 (internal quotation marks omitted).[2]

Singletary's new parole revocation hearing was held on October 30, 2006 before the United States Parole Commission. Singletary Decl. ¶ 16. The Parole Commission determined that there was insufficient evidence to permit a finding of a parole violation and reinstated Singletary to supervised release, which he has successfully completed. *Id.* ¶ 19.

### B.   Procedural History

Plaintiff filed this lawsuit on April 23, 2009, seeking money damages from the District of Columbia under 42 U.S.C. § 1983 for the Board's unlawful revocation of his parole. Compl. at 9

---

2      This critical distinction seemed to elude the District in its briefing and argument on the cross motions for summary judgment. The District contended that the Board "violated its own rules" – rules that simply restate the *Morrissey* minimum due process requirements verbatim – when it revoked Singletary's parole, and it suggested that it was the Board's failure to permit the plaintiff to confront and cross examine the witnesses that led to grant of federal habeas relief. This Court explicitly rejected that argument when it ruled on the District's motion to dismiss**,** *Singletary*, 685 F. Supp. 2d at 93, but the District persisted in this misreading of the D.C. Circuit opinion when it sought summary judgment. Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 11 ("The constraints enumerated in these regulations mirror the precise factors that the Supreme Court identified as relevant in assessing the constitutionality of the revocation of an individual's parole[] and are also the precise factors that the D.C. Circuit found the Board to have violated in revoking the plaintiff's parole.") (citations omitted). Moreover, the District tried to claim during oral argument that section 1983 liability should not be available because the plaintiff had not even established the necessary predicate of a constitutional violation:

> [T]he District has taken the position that the question of whether or not Mr. Singletary's constitutional rights were impinged was not resolved by the D.C. Circuit . . . [L]ooking through the [Singletary decision from the D.C. Circuit] itself, there is language from the holding section in the reported opinion that talks about plaintiff's due process right being impinged. But that, your Honor, is not the sum and substance of the opinion. That's a summary prepared by the reporting service.

Transcript of Motions Hearing ("Tr."), June 20, 2011, at 3–4. If the violation of Singletary's right to due process was not the "sum and substance" of the D.C. Circuit opinion, the Court cannot imagine what was. Neither of the District's arguments can be squared with even a cursory reading of the D.C. Circuit's opinion in *Singletary v. Reilly*, 452 F. 3d at 868.

(demand for relief). The District filed a motion to dismiss [Dkt # 6], which the Court denied on February 18, 2010, because "the District has not shown on the present record and based on the arguments presented in its Motion to Dismiss and supporting briefing that Singletary cannot succeed on his claim." *Singletary*, 685 F. Supp. 2d at 93. Now pending before the Court are the parties' cross motions for summary judgment [Dkt #30 and #32]. The Court heard oral argument on these motions on June 20, 2011.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[3] The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id. See also Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

"The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material

_____

3    The parties informed the Court at the motions hearing that there were no factual disputes and that this case could be decided as a matter of law. Tr. at 6–7, 26.

facts are at issue only for the purposes of its own motion." *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982). In assessing each party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## III. ANALYSIS

### A. A municipality is not immune from liability under §1983.

Section 1983 of the Civil Rights Act provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

In *Monell v. Dep't of Soc. Serv. of the City of New York,* 436 U.S. 658, 690 (1978), the Supreme Court held that local governments are not immune from liability under section 1983, but it specified that "a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be liable under § 1983 on a *respondeat superior* theory." *Id.* "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. The Supreme Court subsequently explained: "while Congress never questioned its power to impose

civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others."* *Pembaur v. City of Cincinnati,* 475 U.S 469, 479 (1986) (emphasis in original). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible." *Id.*

In determining whether a plaintiff has established municipal liability under *Monell*, the court must first determine whether there has been a constitutional violation. *See Baker v. District of Columbia,* 326 F.3d 1302, 1306 (D.C. Cir. 2003). In this case, despite the District's protests to the contrary, *see* note 1*, supra,* that decision has already been made by the D.C. Circuit. *Singletary v. Reilly,* 452 F.3d at 868. Thus, the sole question before this Court is whether the decision made by the Board to revoke the plaintiff's parole in the absence of due process was an act of the District itself to which liability can attach.

To answer that question after *Monell,* courts have considered it necessary to determine whether it was the execution of a governmental policy that caused the constitutional injury. According to the D.C. Circuit:

> [T]here are a number of ways in which a 'policy' can be set by a municipality to cause it to be liable under § 1983: the explicit setting of a policy by the government that violates the Constitution . . . ; the action of a policy maker within the government . . . ; the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom' . . . ; or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations.

*Baker*, 326 F.3d at 1306 (citations omitted). Plaintiff is not seeking to establish here that the Board customarily premised revocation on unreliable hearsay, or that it regularly disregarded the requirements of due process when considering the fate of parolees; nor does he

suggest that the District was deliberately indifferent to the risk that the Board might do so. Rather, the cross motions for summary judgment address whether the instant situation falls within the second of the four scenarios outlined in *Baker*: whether plaintiff's parole revocation was "the action of a policy maker within the government," that is, whether the Board is a body "whose acts or edicts may fairly be said to represent official policy . . . and whose decisions therefore may give rise to municipal liability under § 1983." *Pembaur*, 475 U.S. at 480 (citations omitted).

In *Pembaur,* the Supreme Court stated: "We hold that municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483. Thus, plaintiff has approached this issue by arguing that the Board was "the body responsible for establishing final policy" with respect to parole, and therefore, its decision on a parole matter could form the basis for municipal liability under *Monell.* The Court summarized the positions of the parties when it ruled on the District's motion to dismiss under Fed. R. Civ. P. 12 (b)(6):

> Singletary seeks to prove municipal liability in this case by demonstrating that the decision to revoke his parole was made by the "final municipal decisionmaker and [is] therefore properly attributable to the municipality." *Bd. of the Co. Commissioners of Bryan Co. v. Brown,* 520 U.S. 397, 407 (1997). This is a distinct and independent means of proving municipal liability and does not require Singletary to allege the existence of an explicit policy or practice by the District. *See Baker,* 326 F.3d at 1306 . . . Significantly, the District does **not** dispute that the Board was the final policymaker regarding parole revocation nor does it challenge the sufficiency of Singletary's allegation on that point.

*Singletary*, 685 F. Supp. 2d at 90 (emphasis in original). *See also id*. at 93 ("[A]s noted previously, the District has ***not*** challenged Singletary's allegation that the Board was the District's final policymaker with respect to the issue of parole revocation.").[4]

At the summary judgment stage, though, the District appears to have reversed course once again, *see, e.g., Singletary*, 685 F. Supp. 2d at 93, and it devotes the bulk of its briefing to its present contention that the Board was not the final policy maker for the District on issues of parole. Def.'s Mem. at 6–20. The Court finds the District's arguments to be unpersuasive.

### B. The Board was the final policymaker for the District on matters of parole revocation.

The determination of whether an individual or a government body is a final policymaker with respect to a particular topic is a matter of state law. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124–25 (1988), citing *Pembaur,* 475 U.S. at 483. Plaintiff points to several circumstances that support a finding that at the time of the decision in question, the Board had the final word within city government on matters of parole policy under D.C. law. First, he cites D.C. Code § 24-201.2(a), redesignated as D.C. Code § 24-401.02(a), which provides:

The Parole Board shall:

(1) Determine if and when it in the best interest of society and the offender to release him or her on parole or on conditional release in the case of committed youth offenders;

(2) Determine the terms and conditions of parole of conditional release;

(3) Supervise parolees in the community; and

---

4    In its opinion, the Court did not purport to rule on the ultimate viability of plaintiff's claim. The Court simply found "that the District has not shown on the present record and based on the arguments presented in its Motion to Dismiss and supporting briefing that Singletary cannot succeed on his claim," and it denied the District's motion to dismiss. *Singletary*, 685 F. Supp. 2d at 93.

(4) Determine if and when to terminate parole or conditional release or to modify the terms or conditions of parole or conditional release.[5]

Under the terms of this provision, it was the Board that had broad and exclusive authority to grant, condition, oversee, or revoke parole. The statute also granted the mayor authority to promulgate rules regarding parole, and the mayor, in turn, delegated that authority to the chairman of the Parole Board. D.C. Code § 24-201.03, redesignated as D.C. Code §24-401.03; Mayor's Order 89-10 (Jan. 6, 1989), 36 D.C. Reg. 1254 (Feb. 10, 1989). The Board's rules and regulations have the force and effect of law. *Cosgrove v. Thornburgh*, 703 F. Supp 995, 1001–03 (D.D.C. 1988). Finally, plaintiff points out that there was no administrative or executive review within the D.C. government for a decision by the Board to revoke parole. D.C. Sec. Supp. Answer to Singletary Interrog. at No. 4 (Ex. 2 to Plaintiff's Cross Motion for Partial Summary Judgment on the Issue of Liability ("Pl.'s Mem").

In response, the District argues that the Parole Board was not a final policymaker because the mayor delegated his statutory rulemaking authority to the chairman of the Parole Board rather than to the Board as a whole. Def.'s Mem at 17. According to the District, this means the Board was constrained by rules and regulations that were not of its making. Tr. at 18. But the delegation of rulemaking authority to the chairman instead of to the entire Board is a mere formality that does not change the fact that policymaking authority was located within the Board and not somewhere else in city government. As plaintiff characterizes it, "the power [to promulgate rules] was internal to the Board and not external." Pl.'s Mem. at 11. In fact, when the Court asked counsel for the District at oral argument which governmental entity promulgated the policies that were in place at the time of Singletary's revocation hearing, he

---

[5] In 2007, the D.C. Parole Board was abolished and its responsibilities were assumed by the United States Parole Commission. *See* D.C. Code § 24-131; *see also Crawford*, 323 F.3d at 125–26.

stated: "it's an executive regulation, but it came through the parole board and went through review and comment." Tr. at 16–17. So the District has not shown that the Board was subject to rules devised for it by someone else.

The District relies on several cases to support its argument that municipal liability does not attach when "officials are constrained by policies not of the official's making even when the officials have significant discretionary authority in the area that is the subject of the lawsuit." Def.'s Mem. at 13. But those cases are distinguishable from the situation presented here. *Triplett v. District of Columbia*, 108 F.3d 1450 (D.C. Cir. 1997), involved two correctional officers who caused serious injury when they used excessive force in handling a prisoner. The court ruled that they obviously did not possess final policymaking authority on the use of force in restraining D.C. prisoners, and therefore, there could be no municipal liability for their wrongful conduct consistent with the bar on vicarious liability in *Monell*. *Id*. at 1454. The District's Parole Board – the city's ultimate decision maker on matters of parole – cannot be compared to two employees at the bottom of the chain of command for the D.C. Department of Corrections.

None of the other cases cited by the District involve municipal "actors" similar to the Parole Board either. *See, e.g., Bolton v. City of Dallas*, 541 F.3d 545, 550 (5th Cir. 2008) (finding that city manager was not a final policymaker with respect to an employment decision); *Rasche v. Village of Beecher*, 336 F.3d 588, 600 (7th Cir. 2003) (determining that a code enforcement office, whose duties included identifying zoning violations and issuing tickets, was not a final policymaker); *Jett v. Dallas Ind. Sch. Dist.*, 7 F.3d 1241, 1249–50 (5th Cir. 1993) (finding that superintendent of school district was not a policymaker because he was following policy decisions set by the district's board of trustees). The District cites *Banks v. District of*

*Columbia*, 377 F. Supp. 2d 85 (D.D.C. 2005) but that case does not support its position. In *Banks*, the Court determined that the Director of the Department of Mental Health was a final policymaker who could establish municipal liability because of her "vast responsibilities and expansive authority" and because as a director of her department, she was "responsible for promulgating rules to run" that department. *Id*. at 91–92. Like the Director of Mental Health in *Banks*, the Parole Board held the authority to promulgate its own rules.

The District argues next that the Board lacked policymaking authority because whatever authority it exercised had been delegated to it by the mayor. This argument is without merit because the Supreme Court's decision in *Pembaur* specifically recognized that final policy making authority "may be granted directly by legislative enactment or may be delegated by an official who possesses such authority." *Pembaur*, 475 U.S. at 483. The District's point is that if the mayor granted the authority, he could also revoke it at any time. But the possibility that the Board's authority could hypothetically be revoked does not mean that the Board did not possess it at the time in question. If the District's argument were to prevail, no authority delegated to any individual or governmental body could ever be considered final, and that would be inconsistent with the Supreme Court's statement in *Pembaur*.

The District also contends that the Board lacked final policymaking authority because its policies could be legislatively overruled and its revocation decisions were subject to habeas review. If the availability of judicial or legislative review meant that an entity was not a policymaker for *Monell* purposes, then no one in the executive branch would ever be considered a final decision maker under section 1983. This is clearly not the result contemplated by the Supreme Court. *See Pembaur*, 475 U.S. at 479. Indeed, the District seemed to recognize this when it wrote: "[F]inal policymaking authority over a particular subject area does not vest in an

official whose decisions in the area are subject to meaningful *administrative* review." Def.'s Mem. at 18, citing *Scala v. Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997) (emphasis added). While the availability of administrative review within the executive branch would be a factor that would weigh against a finding that the initial decisionmaker lacked policymaking authority, that argument by its terms does not include the possibility of court review or a legislative override.

The District points to cases that it claims stand for the proposition that an official whose decisions are reviewable by "any other body" is not a final policymaker. *See Beattie v. Madison County School Dist.*, 254 F.3d 595, 602–03 (5th Cir. 2001); *Worsham v. City of Pasadena*, 881 F.2d 1336, 1341 (5th Cir. 1989). But these cases are distinguishable. In *Beattie*, for example, the court's discussion of final policy making authority was related to a supervisor who recommended to a School Board that another employee should be terminated. *Beattie*, 254 F.3d at 602–03. In the District, there was no other body that needed to approve the Board's decisions about parole before they took effect. In fact, there is no administrative review available within the D.C. government for a decision made by the Parole Board, and even judicial review is quite limited because the court must defer to the administrative body. *See Johnson v. Reilly*, 734 F. Supp. 2d 26 (D.D.C. 2010). Thus, the Board is the final word on parole for the District of Columbia. D.C. Sec. Supp. Answer to Singletary Interrog. at No. 4 (Ex. 2 to Pl.'s Mem). In light of all of these factors, the Court finds that as a matter of state law, the Board was the District's final policymaker with respect to the issue of parole revocation.

## C. The District can be liable for a single Board decision.

The District takes the position that even if the Board was the ultimate policy maker with respect to parole for the municipality, it can only be held liable under section 1983 for an injury

caused by an unconstitutional *policy* it promulgated*,* and not for one of its individual *decisions.* But the Supreme Court has expressly rejected that distinction. *Monell* held that a governmental body may be sued if it caused a constitutional violation through "a policy statement, ordinance, regulation, *or decision* . . ." 436 U.S. at 690 (emphasis added), and the Court subsequently stated: "it is plain that municipal liability may be imposed for a single decision by municipal policy makers under appropriate circumstances." *Pembaur*, 475 U.S. at 480.

In *Pembaur,* the Court determined that a County Prosecutor "was acting as the final *decisionmaker* for the county" when he directed the County Sheriff to take the action deemed to be unconstitutional – the forcible entry of a medical clinic in an effort to serve capiases on third parties. 475 U.S. at 485 (emphasis added). *See also id*., at 484 ("The Prosecutor made a considered decision based on his understanding of the law and commanded the officers to forcibly enter the clinic."). Indeed, the entire thrust of the *Pembaur* decision was to explain that even isolated decisions could constitute "policy" for purposes of imposing section 1983 liability on municipalities under *Monell.*

> [A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where the action is directed by those who establish government policy, the municipality is equally responsible whether that action is taken only once or to be taken repeatedly.

*Id.* at 481. Applying that principle, a decision by the Board, which was the District's final decisionmaker with respect to parole and parole policy, was an act of official government policy to which section 1983 applies. *See Meyers v. City of Cincinnati,* 14 F.3d 1115, 1118 (6th Cir.

1994) ("If the decision to punish [the assistant fire chief] was made by the 'government's authorized decisionmakers' the City is responsible.") [6]

The District relies heavily upon *Praprotnik*, but that case does not change the result here. Like most of the cases cited by the District, the case involved whether liability could be imposed based upon employment actions taken by the plaintiff's supervisors. The Court found that the municipality could not be liable because it concluded, as a matter of state law, that the city officials who made the challenged decisions were not the makers of municipal policy for matters of personnel administration. *Praprotnik*, 485 U.S. at 128. So the *Praprotnik* opinion did not directly address the issues presented in this case.

The key sentence in *Praprotnik* upon which the District relies – ("Aware that governmental bodies can act only through natural persons, the Court concluded that those governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights") – does appear in the introductory section of the opinion where the Court reviews the holding in *Monell* and recounts its rejection of *respondeat superior*. 485 U.S. at 122. But then the Court goes on to state:

> In the years since *Monell* was decided, the Court has considered several cases involving isolated acts by government officials and employees. We have assumed that an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.

---

6       In *Meyers,* the court found that the city could be liable under *Monell* when an official in the Fire Department was demoted and forced to retire in violation of his First Amendment rights even though the City was "not accused of routinely disciplining employees for exercising First Amendment rights or of having an official promulgated policy to that effect." *Id.* at 1117. The court stated: "The requirement that a municipality's wrongful actions be a 'policy' is not meant to distinguish isolated incidents from general rules of conduct promulgated by city officials. It is meant to distinguish those injuries for which 'the government as an entity is responsible under §1983' . . . from those injuries for which the government should not be held accountable. '*Monell* is a case about responsibility.'" *Id.* (citations omitted)

*Id.* at 123.

What *Praprotik* teaches is that the authority to make municipal policy that is the linchpin for liability must be the authority to make *final* policy. *Id.* at 127.

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them are the act of the municipality. Similarly, when a subordinates' decision is subject to review by the municipality's authorized policy makers, they have retained the authority to measure the officials' conduct for conformance with *their* policies.

*Id.* Thus, even under *Praprotnik,* since the parole revocation was "a single decision taken by the highest officials responsible for setting policy in that area of the government's business," and since the Board was not constrained by policies made by a higher body and its decisions were not subject to review by other city officials, the decision can form the basis for liability under section 1983.

Several weeks after the hearing on the cross motions in this case, the District focused in more closely on the issue of interest to the Court, and on July 8, 2011, it supplemented its pleadings with a notice of additional authorities that supposedly stand for the proposition that there can be no municipal liability for local entities performing quasi-judicial functions or discretionary functions. [Dkt #38]. But the cases provided to the Court – notwithstanding the fact that the defendant labeled each page of them in large red capital letters (*e.g.*, "NO MUNICIPAL LIABILITY FOR QUASI JUDICIAL FUNCTION")[7] – do not deal with quasi-judicial functions, nor do they stand for the principles for which they were cited.

---

7       The Court would greatly prefer if in the future, the Office of the Attorney General would refrain from submitting authority to the Court with portions highlighted and/or pages labeled in this manner. The better practice would be to address the relevant portions of the cases in a pleading.

The case, *Dick v. Watonwan County,* 738 F.2d 939 (8th Cir. 1984), must have caught the District's attention because it referred to the defendant as the "Board." But the case did not involve a quasi-judicial board making a flawed decision – it involved the actions of a few overzealous social workers who were employed by an agency called the Tri-County Human Services Board. The case addressed the question of whether the employer – in this case, the "Board" – and the county involved could be held liable for the individual employees' questionable exercise of judgment. The case set forth the principle that a policy that permits individual municipal officers to exercise their own discretion is not necessarily an unconstitutional policy or one that can be deemed to be the "moving force" behind a constitutional violation for purposes of *Monell. Id.* at 943. The other Eighth Circuit cases cited by the government applied this principle.[8] All of the cases supplied in the District's Notice dealt

_____

8    In *Zumwalt v. City of Wentzvile,* No. 10-cv-00561, 2010 WL 2710496 (E.D. Mo. July 7, 2010), the plaintiff claimed in a "frequently unintelligible" complaint, *id.* at *4, that he had been fired from his city job in retaliation for his exercise of his first amendment rights. He argued that a policy according city employees the authority to use their own judgment in making employment decisions was tantamount to an unconstitutional policy. Citing *Dick,* 738 F. 2d at 942, the Court disagreed.

*Bush v. St. Louis County,* No. 10-cv-00544, 2010 WL 5071330 (E.D. Mo. Dec. 7, 2010) did not analyze the liability of quasi-judicial bodies either. The complaint in that case concerned the discharge of a public employee, who complained that the decision was made arbitrarily and without the necessary procedural safeguards. The court noted that the plaintiff had failed to allege that there was a custom or policy of unlawful employment practices, and it cited *Zumwalt* without more.

Finally, *Moyle v. Anderson,* 571 F.3d 814 (8th Cir. 2009), dealt with a correctional officer's decision to assign a dangerous prisoner to be confined in the jail's general intake unit rather than in a separate cell. The Court relied on its decision in *Dick* to conclude that a policy that called for segregating high risk inmates, but afforded the officer the discretion to seek additional information before designating a prisoner, was not an unconstitutional policy. *Id.* at 818.

The Fourth Circuit case cited by the District, *Hassell v. City of Chesapeake, Virginia,* 64 F. Supp. 2d 573 (E.D. Va. 1999), *aff'd* 230 F.3d 1352 (4th Cir. 2000), involved a decision made

with whether an individual municipal employee's isolated decision could be imputed to the city, and they did not address the issues before the Court.

In response to the District's Notice, the plaintiff brushed away the authorities as inapposite and pointed to several cases that "recognize the availability of municipal liability under § 1983 with respect to quasi-judicial action." [Dkt #39]. In *Loreto Dev. Co., Inc., v. Village of Chardon, Ohio,* No. 97-3302, 1998 U.S. App. LEXIS 12183 (6th Cir.) (unpub. op.), the court stated that the village "may be held liable for the acts of its Board of Zoning and Building Appeals due to the fact that the municipality conferred final policy making authority on this Board and the fact that the decision of the zoning Board constitutes an action taken under state law." *Id.* at *7. In *Schiazza v. Zoning Hearing Bd*., 168 F. Supp. 2d 361, 372–73 (M.D. Penn. 2001), the court similarly concluded that since a zoning hearing board had final authority to determine municipal policy for the township, at least with respect to granting or denying variances or special exceptions, it could be liable under section 1983. In *Cox, et. al., v. City of Dallas,* No. 98-1763, 2004 U.S. Dist. LEXIS 18968 (N.D. Tex. Sept. 22, 2004), the court took note of the *Schiazza* opinion and observed that the Dallas Board of Adjustment did have final authority to establish that part of municipal zoning policy concerning the grant or denial of variances or special exceptions. "Because the Board of Adjustment has final authority concerning the enforcement of zoning decisions, its decisions constitute municipal policy and

---

by a single supervisory employee to subject a subordinate to a drug test. The District describes the holding as "no municipal liability for discretionary function." But the Court made a factual finding in that case that the employee who ordered the plaintiff to submit to the test was not a final policymaker for substance abuse policy for the city, and it was on those grounds that it ruled that her decision – applying an existing policy to the facts before her – would not support municipal liability under *Monell*. *Id*. at 578.

make it a policymaker for the City for purposes of § 1983." *Id.* at *23.[9]  Neither party has provided with court with authority involving an unconstitutional parole revocation.

### D. The District would be liable for the Board's decision even if the Court did not apply the policymaker analysis.

The District has recast its position a number of times, but there is some merit to its concern that a parole revocation decision does not fall neatly into the rubric set out in *Pembaur* and *Praprotnik.*  Under that approach, the court determines first whether the individual or entity that caused the constitutional deprivation was the final municipality's final policymaker for a particular subject matter area.  If so, then any decision it made related to that area can be the predicate for municipal liability.  That was the gist of plaintiff's argument on summary judgment and the approach the Court appeared to be taking at the 12(b)(6) stage.  *Singletary*, 685 F. Supp. 2d at 93.  And as set forth above, there is clear support in the precedents of both the Supreme Court and this Circuit for a ruling in plaintiff's favor based on that approach.

---

9       The court in *Cox* also stated: "In suing a municipality, a plaintiff must first prove there was an official action by showing 'three elements: a policy maker; an official policy; and a violation of constitutional rights whose moving force' is the policy or custom." 2004 U.S. Dist. LEXIS 18968 at *20, quoting *Piotrowski v. Houston,* 237 F.3d 576, 578 (5th Cir. 2001).  This language can be read to support the District's argument that the fact that the unconstitutional decision was made by a policymaker is not enough – it must be an unconstitutional policy that caused the constitutional deprivation. *See* Def. Opp. to Pl.'s Mem. at 13.  But the three step analysis has not been adopted by this Circuit.  And, even when applying the three part test, the court in *Cox* made it clear that a single decision by a policymaker could trigger liability.  "An official policy is (1) a policy statement, ordinance, regulation *or decision* that is adopted and promulgated by the governing body or by an official who has policymaking authority; *or* (2) a persistent, widespread practice . . ."  *Cox*, 2004 U.S. Dist. LEXIS 18968 at * 27. (emphasis added).  In other words, it does not have to be both. The court described the characteristics of a policy maker: "A policymaker takes the place of the governing body in a designated area of city administration; he decides the goals for a particular city function, devises the means of achieving those goals, and is not supervised in the area of his responsibility except as to the totality of his performance."  *Id.*, at *21–22.  In this case, the Board took the place of the city government in a designated area of city administration, it established its own policies and procedures, and it operated free from oversight, so its decision can be imputed to the city.

But this Court has wrestled with this opinion because the policy maker analysis seems better suited to a situation where a high ranking municipal employee, as in *Pembaur,* issues an isolated directive ("Round up the usual suspects!") or makes a policy choice with broad general application, rather than when a quasi-judicial body – one that is charged with making multiple, regular, individual decisions – goes about making one of them unlawfully. The policy analysis seems particularly unsuited to the case before the Court since the parole revocation policy promulgated by the Board – which was followed in this instance – did not itself violate the Constitution. As the District points out, there is broad language in some of the cases that have elaborated on *Monell* that suggests that the Court must find that it was the municipal policy – and not an individual decision made pursuant to that policy – that was unconstitutional before liability can be imposed on a municipality. *See, e.g., Praprotnik,* 485 U.S. at 123 ("[T]he challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business."); *id.* at 128 ("[T]he city cannot be held liable under § 1983 unless respondent proved the existence of an unconstitutional municipal policy.").

In response, plaintiff correctly states that *Pembaur* and *Baker* permit this Court to hold that the Board was executing "policy" when it was making one of its "decisions." This approach has its drawbacks, though, as it seems to strip the word "policy" of its ordinary meaning.

But that does not mean that the plaintiff is not entitled to judgment in this case. In the Court's view, it can grant summary judgment for the plaintiff without wading into the muddy waters of the policy maker analysis, because a more straightforward answer can be found if one returns to the Supreme Court's opinion in *Monell.* The cases distinguishing policy makers from

others grew out of that decision, but the distinction was not what the case was about.  What the Supreme Court held was:

> Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies.  Local government bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.

*Monell*, 436 U.S. at 690 (emphasis added).  Thus, the overarching principle established in *Monell* was that there could be municipal liability for an official governmental action, whether it comes in the form of a policy, regulation, or "decision."

"*Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered." *Pembaur,* 475 U.S. at 480.  In the years after *Monell,* if the decision in question was made by the local governing body, such as when the City Council cancelled a concert in violation of the First Amendment in *Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981), or the City Council fired the police chief without a hearing in *Owen v. City of Independence,* 445 U.S. 622 (1980), no further analysis was required.  As Justice Brennan wrote in his concurring opinion in the *Praprotnik* case, "[i]n these cases we neither required nor, as the plurality suggests, assumed that these decisions reflected generally applicable 'policies' as that term is commonly understood, because it was perfectly obvious that the actions of the municipalities' policymaking organs, whether isolated or not, were properly charged to the municipalities themselves."  485 U.S. at 138–13 (1988) (Brennan, J., conc.)

Plaintiff approached this case from that angle when he argued: "There is . . . nothing exceptionable in holding a municipality liable for acts undertaken by final policymakers (even

those holding authority by virtue of delegation) provided only that that area of the city's business has been delegated to them and that there is no practical right of administrative review of their decisions." Pl's Opp. to Def's Mem. [Dkt #31] at 16. What the Court understands the plaintiff to be saying is that when the Board made a decision concerning parole revocation, in essence, it *was* the District. The Board was issuing the District's final word on the subject within its purview, and therefore, liability can be imputed to the District. The Court agrees. *See Hampton Co. Nat. Sur., LLC v. Tunica County, Miss.*, 543 F.3d 221, 227 (5th Cir. 2008) (reversing district court determination that county was not liable for sheriff's actions because "the sheriff's decision . . . is the kind of single decision by the relevant policymaker that can be the basis of liability); *Seamons v. Snow*, 206 F.3d 1021, 1029 (10th Cir. 2000) (stating that school district was subject to liability where it had delegated authority to football coach to make final decisions regarding team membership).

What the Supreme Court did in *Monell* was review the legislative history of the Civil Rights Act in detail and overturn the opinion in *Monroe v. Pape*, 365 U.S. 167 (1961), which held that Congress intended municipalities to be absolutely immune from suit under section 1983. The Court was quite clear that there were limits to what it was announcing at that time*:* "Since this case unquestionably involved official policy as the moving force of the constitutional violation found by the District Court . . . we must reverse the judgment below. In doing so, *we have no occasion to address and do not address what the full contours of municipal liability under § 1983 may be*." 436 U.S. at 694–95. So the court did not hold that *unless* municipal policy was the moving force behind the violation, liability will not attach – it held that *because in that case* municipal policy was the moving force behind the violation, liability did attach. It

follows then that if in a later case, it is determined that an official "ordinance, regulation, or decision" caused the injury, *see id.* at 690, that too could be grounds for liability.

The *Monell* opinion made it clear that it was not outlining the contours of municipal liability for all purposes. The Court declared that governmental bodies are not wholly immune, and it also established the important principle that liability could not be vicarious. "In particular, we conclude that municipality cannot be held liable *solely* because it employees a tortfeasor." *Id.* at 691 (emphasis in original). The Court explained that such a rule was needed to implement the causation requirement in the statute, which imposes liability on any person who "subjects" a person to a deprivation of rights or one who "causes" a person "to be subjected" to a deprivation of rights. *See id.* at 692, citing 42 U.S.C. § 1983. The Court stated that the language in the statute that imposes liability on a person who "causes" an employee to violate another's constitutional rights "cannot be easily read to impose liability vicariously on government bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Id.*

The purpose of the policymaker analysis, then, was to provide guidance for those cases, such as *City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985), or *Praprotnik,* 485 U.S. at 112, where it was *necessary* to differentiate the acts of a municipal employee from the acts of the municipality itself. "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to actions for which the municipality is actually responsible." *Pembaur,* 475 U.S. at 479.

As Justice Brennan wrote in his concurrence in *Praprotnik*:

> Our decision in *Monell,* interpreting the statute to require a showing that [constitutional] deprivations arise from municipal policy, did not employ the policy requirement as an end in itself, but rather as a means of determining which acts by municipal employees are properly attributed to the municipality. Congress, we held, did not intend to subject cities to liability simply because they employ tortfeasors. But where a municipality's governing legislative body inflicts the constitutional injury, the municipal policy inquiry is essentially superfluous . . .

485 U.S. at 139 n 3.

The Court concludes that at bottom, in this case, the municipal policy inquiry is superfluous. There is no danger that finding the city to be responsible for the decision of its parole board would be imposing the kind of vicarious liability based "solely" on the acts of individual, rogue employees that was prohibited by *Monell*. In this case, the injury "was inflicted by . . . those whose edicts or acts may fairly be said to represent official policy," *Praprotnik,* 485 U.S. at 121–22 (internal quotation marks omitted), and the revocation of plaintiff's parole was therefore an "act[] 'of the municipality,' – that is, [an act] which the municipality has officially sanctioned or ordered." *Pembaur,* 475 U.S. at 481. So, even if the two step policy test is not perfectly apt in this case, plaintiff is entitled to judgment as a matter of law.

### E.  The Court is bound to construe §1983 broadly.

In the end, faced with a difficult question of first impression, this Court considered whether the Supreme Court had provided any direction on how close questions should be resolved in the future. On that point, the Court was unequivocal:

> [T]here can be no doubt that § 1 of the Civil Rights Act was intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected rights.

*Monell,* 436 U.S. at 700–01. The *Monell* opinion quotes verbatim from the legislative history on this point:

> [T]his act is remedial, and in aid of the preservation of human liberty and human rights. All statutes and constitutional provisions authorizing such statutes are liberally and beneficently construed. It would be most strange and, in civilized law, monstrous, if this were not the rule of interpretation.

*Id.* at 684, quoting Cong. Globe, 42d Cong., 1st Sess., App. 335–336. The Court went on:

> In both Houses, statement of the supporters of § 1 corroborated that Congress, in enacting § 1, intended to give a broad remedy for violations of federally protected civil rights.

*Id.* at 685. The fact that that Supreme Court explicitly underscored the need to construe the act broadly lends further support to this Court's conclusion that Mr. Singletary should prevail in his action.

Therefore, based on a thorough consideration of the cross motions for summary judgment, the oppositions, and the entire record of this case, the Court will deny the District's motion for summary judgment and grant plaintiff's partial motion for summary judgment. The only remaining issue is a determination of damages. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: August 1, 2011

25